BC
FILED
6/15/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

NF

RECEIVED
6/8/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

JKS

**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MATTHEW D. YEAGER,

      Plaintiff,

      v.

JONATHAN D. STEELE ESQ,
CANDACE L. MEYERS ESQ,
JOHN M. D'ARCO ESQ,
BEERMANN LLP,
PAMELA SOCHOR and
KWAME RAOUL,

      Defendants.

Civil No.    1:26-cv–_____

District Judge _____

**Complaint and Jury Demand**

<span style="color:red">1:26-cv-06793
Judge Sharon Johnson Coleman
Magistrate Judge Keri L. Holleb Hotaling
Random/Cat 2</span>

Plaintiff Matthew D. Yeager for his Complaint against Defendants **hereby requests a trial by jury** pursuant to Rule 38(b) and alleges as follows:

**– PRELIMINARY STATEMENT –**

1.    Plaintiff Matthew D. Yeager brings this action to address the use of state statutory mechanisms within an ongoing post-decree custody proceeding[1] ("Custody Matter") that have resulted in the reclassification of independent trust assets as Plaintiff's personal property. Plaintiff's ex-wife, Defendant Pamela Sochor, expressly waived any interest in the assets held by various independent third-party trusts (herein referred to as "Yeager Trusts") under the 2021 Marital Settlement Agreement ("MSA"). The Yeager Trusts are irrevocable, independent third-party trusts whose beneficiaries include blood descendants of the founder of a $10 billion publicly traded enterprise where Plaintiff is an executive (herein referred to as "Yeager Corp"), including Plaintiff's minor daughter GY. Plaintiff does not control the Trusts or their assets.

---

[1] The Custody Matter is currently pending under Cook County Case No. 2020-D-002239 before Cook County Associated Judge Geri Pinzur Rosenberg with a trial date set for August 2026.

1

*Yeager v. Steele*

2. In the Custody Matter, the state court has previously applied 750 ILCS 5/501(c-1)(1) and 750 ILCS 5/508 (collectively, the "Fee Statutes") in a manner that treated trust assets as Plaintiff's personal "ability to pay." A future hearing scheduled for June 10, 2026 is expected to apply the same statutory framework. The resulting judgment would be enforceable in the name of Beermann LLP and would again rely on the reclassification of trust assets to satisfy litigation-related obligations.

3. The Yeager Trusts collectively hold approximately 62.2% of the voting power of Yeager Corp. Plaintiff alleges that Defendants' coordinated litigation actions concerning the potential liquidation or disposition of this voting block constitute conduct falling within Section 13(d)(3) of the Securities Exchange Act. Plaintiff further alleges that these actions support a plausible inference of a statutory "Group" formed for the purpose of acting in concert with respect to the acquisition, holding, or disposition of Yeager Corp securities. Defendants have not filed a Schedule 13D disclosing any coordinated control purpose or group composition. Plaintiff seeks prospective injunctive relief under Section 27 of the Exchange Act to ensure compliance with federal disclosure requirements.

– JURISDICTION AND VENUE –

4. <u>Federal Question Jurisdiction</u>: This action arises under the Constitution and laws of the United States. The Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under the Fifth and Fourteenth Amendments, actionable through 42 U.S.C. § 1983, and claims under the Securities Exchange Act of 1934. Jurisdiction also exists under 28 U.S.C. § 1343(a)(3) because Plaintiff seeks redress for alleged deprivations of constitutional rights committed under color of state law.

2      *Yeager v. Steele*

5.      Exclusive Securities Jurisdiction: The Court has exclusive jurisdiction over Plaintiff's Exchange Act claim pursuant to § 27 of the Securities Exchange Act, 15 U.S.C. § 78aa. Resolution of this claim requires interpretation and enforcement of Section 13(d) and SEC Rule 13d-5, matters committed exclusively to federal courts.

6.      Statutory Vehicle for Takings Clause Claim: Plaintiff invokes the immediate federal ripeness of Takings Clause claims as confirmed in *Knick v. Township of Scott*, 588 U.S. 180 (2019). Plaintiff also cites *DeVillier v. Texas*, 601 U.S. 285 (2024), which recognizes that individuals must have a judicial avenue to seek compensation for alleged property deprivations. Plaintiff brings these constitutional claims under 42 U.S.C. § 1983, which provides the statutory vehicle for seeking damages for alleged deprivations committed under color of state law. Plaintiff seeks retrospective damages for completed injuries.

7.      Inapplicability of the Domestic Relations Exception: The Domestic Relations Exception does not apply. Plaintiff does not seek modification of custody, parenting time, or support. The property division concluded in 2021, and the claims asserted here concern constitutional and securities violations arising post-decree. See *Marshall v. Marshall*, 547 U.S. 293 (2006); *Struck v. Cook County Public Guardian*, 508 F.3d 858 (7th Cir. 2007).

8.      Abstention not Appropriate: Abstention doctrines do not bar this action. Plaintiff seeks (a) retrospective monetary damages for alleged completed constitutional violations, and (b) prospective injunctive relief solely to enforce federal securities-law disclosure duties under Section 13(d). The state forum does not possess jurisdiction to adjudicate Exchange Act claims or enforce federal disclosure obligations. Additionally, the Seventh Circuit's en banc decision in *Gilbank v. Wood County DHS* (7th Cir. 2024) confirms that the "inextricably intertwined" test is no longer operative in this Circuit.

3                                                                                    *Yeager v. Steele*

9.    Venue. Venue is proper in this District under 28 U.S.C. § 1391(b) because all Defendants reside in this District and the events giving rise to the claims occurred here.

## – PARTIES –

10.    **Plaintiff Matthew D. Yeager** is a natural person and a resident of Cook County, Illinois. Plaintiff is an executive officer of Yeager Corp and is a designated beneficiary holding a vested equitable title and property interest in the independent, irrevocable Yeager Trusts established for the blood descendants of the founder of Yeager Corp

11.    **Defendant Jonathan D. Steele Esq** is an attorney licensed to practice law in the State of Illinois and is a partner at Beermann LLP. Defendant Steele is the lead attorney in the Custody Matter and he is sued in his individual capacity under 42 U.S.C. § 1983.

12.    **Defendant Candace L. Meyers Esq** is an attorney licensed to practice law in the State of Illinois and is a partner at Beermann LLP. Defendant Meyers acts as co-counsel in the Custody Matter and is sued in her individual capacity under 42 U.S.C. § 1983.

13.    **Defendant John M. D'Arco Esq** is an attorney licensed to practice law in the State of Illinois and is the managing partner of Beermann LLP. He possesses supervisory authority over the litigation strategy, statutory deployment, and fee petitions enacted in the Custody Matter. Defendant D'Arco is sued in his individual capacity under 42 U.S.C. § 1983.

14.    **Defendant Beermann LLP** is a domestic company headquartered in Chicago, Illinois, operating as a specialized matrimonial and family law firm. Defendant Beermann LLP is the institutional entity driving the fee petitions and direct-enforcement actions in the Custody Matter, and is sued under 42 U.S.C. § 1983 under a joint-action and entity-liability framework.

4                                                                                    *Yeager v. Steele*

15. **Defendant Pamela Sochor** is a natural person and resident of Cook County Illinois. She is the ex-wife of Plaintiff Matthew D. Yeager and the co-parent of their minor child, GY. Defendant Sochor is a signatory to the binding 2021 MSA.

16. **Defendant Kwame Raoul** is the Attorney General and chief law enforcement officer and is named because of the as-applied constitutionality challenges raised against the Fee Statutes, in accordance with *Ex parte Young*, 209 U.S. 123 (1908).

## - FACTUAL BACKGROUND -

### A. The 2021 MSA and the Vested Waiver of Trust Claims

17. In 2021, Plaintiff and Defendant Sochor executed their MSA which fully resolved the division of marital property. As part of that agreement, Defendant Sochor expressly waived any present or future claim to the Yeager Trusts, which were established for the blood descendants of the founder of Yeager Corp.

18. The Yeager Trusts hold private, non-marital assets for approximately a dozen Yeager family members, including Plaintiff and his minor daughter GY. One of the trust assets consists of approximately 62.2% of the total voting float of Yeager Corp, a publicly traded company. This block represents a significant concentration of voting power in the issuer.

19. Plaintiff exercises no control over the Yeager Trusts. The trusts are administered by independent fiduciaries, and Plaintiff lacks authority over trust management, distributions, or the disposition of trust assets.

### B. The Post-Decree Custody Matter and the Fee Statutes

20. Following the entry of the 2021 MSA, the parties entered post-decree custody litigation in 2024 concerning parenting issues. Property division was fully resolved in 2021 and is not at issue in the Custody Matter.

**5** *Yeager v. Steele*

21. During the Custody Matter, Defendants Steele, Meyers, and D'Arco, acting through Beermann LLP, have filed multiple motions under the Fee Statutes. These papers seek fee awards enforceable in the name of Beermann LLP and rely on the statutory mechanisms that permit interim fee determinations based on attorney representations and financial summaries.

22. The Fee Statutes, as amended in 2016, authorize family courts to award interim attorney's fees without conducting evidentiary hearings. Under these provisions, courts may rely on attorney certifications, financial summaries, and other non-testimonial materials in lieu of sworn testimony or cross-examination.

23. In their filings under the Fee Statutes, Defendants assert financial positions that treat the assets of the Yeager Trusts as part of Plaintiff's personal liquidity, notwithstanding Plaintiff's lack of ownership or control over those assets. Thereby, the procedural posture improperly evaluates Plaintiff's "ability to pay" based on a third party asset pool.

**C.      The October 6 2025 First Judicial Taking**

24. On June 24, 2025, August 19, 2025, and March 18, 2026, Defendant Meyers filed fee petitions under the Fee Statutes that measured Plaintiff's "ability to pay" by reference to the asset base of the Yeager Trusts. Plaintiff repeatedly and strenuously objected to each such petition, citing the 2021 MSA waiver and the independent nature of the trusts. The petitions sought approximately $10,000, $65,000, and $180,000, respectively.

25. On October 6, 2025, the state court granted the second petition and ordered Plaintiff to pay $95,000. The award **exceeded the request by $30,000** and was based on an assessment that treated the assets of the Yeager Trusts as part of Plaintiff's "ability to pay."

26. The October 6, 2025 order attributed the assets held by the independent Yeager Trusts to Plaintiff personally for purposes of interim fee liability. Because Plaintiff lacks ownership or control over the trust assets, the order had the effect of requiring Plaintiff to satisfy

**6**                                                                                   *Yeager v. Steele*

obligations based on property held by independent fiduciaries. Plaintiff alleges that this order created a financial posture in which compliance could require liquidation of trust assets and that subsequent proceedings referenced the possibility of contempt sanctions.

**D.      The Imminent June 10, 2026 Second Judicial Taking**

27.      Defendants have filed additional fee petitions under the Fee Statutes seeking further interim fee awards. A hearing is scheduled for June 10, 2026, at which Defendants seek another substantial award based on the same attribution of Yeager Trust assets to Plaintiff's personal "ability to pay." This anticipated order is referred to as the "Second Judicial Taking."

28.      In prior proceedings, the state court indicated that non-payment of an interim fee award could result in contempt sanctions, including incarceration. Plaintiff alleges that the June 10, 2026 scheduled hearing presents a similar posture, in which failure to satisfy the anticipated award may result in immediate contempt consequences.

29.      Plaintiff alleges that satisfying a substantial interim fee award based on trust-asset attribution could require liquidation of Yeager Trust assets. Under the Yeager Corp Certificate of Incorporation, a transfer of certain trust-held shares to non-permitted transferees triggers a conversion mechanism that alters the voting characteristics of those shares. Such a conversion would reduce the voting power of the trust-held block and implicates issuer governance.

**E.      Defendants Coordinated Campaign Directed at Yeager Corp**

30.      Plaintiff alleges that Defendants' filings under the Fee Statutes were executed in a sequence and manner that differed from typical post-decree fee-recovery practices. Plaintiff further alleges that these filings had foreseeable implications for assets held by the Yeager Trusts, including trust-held shares of Yeager Corp.

31.      <u>Phase One — Commercial Alignment</u>. Under Section 13(d)(3) of the Exchange Act and SEC Rule 13d-5, a statutory "Group" may arise when two or more persons act together

**7**                                                                                   *Yeager v. Steele*

for the purpose of acquiring, holding, or disposing of securities. Plaintiff alleges that Defendant Sochor and the Beermann Defendants acted in a coordinated manner with respect to enforcement actions that could affect trust-held Yeager Corp securities. Plaintiff further alleges that the use of 750 ILCS 5/508(a) to seek judgments payable directly to Beermann LLP has the effect of creating a mechanism through which trust-held shares can be liquidated or transferred.

32. <u>Phase Two — Governance Effects of Share Transfer Provisions</u>. The Yeager Corp Certificate of Incorporation contains provisions governing the transfer of certain trust-held shares. Plaintiff alleges that a court-ordered transfer of these shares to a non-permitted transferee would trigger a conversion mechanism that alters the voting characteristics of the shares. Such a conversion would reduce the voting concentration associated with the trust-held block.

33. <u>Phase Three — Timing of Filings</u>. Plaintiff alleges that fourteen (14) enforcement-related filings were made during periods that coincided with Yeager Corp earnings adjustments, quiet periods, or other market-sensitivity windows. Plaintiff pleads these allegations to support the inference of coordinated timing relevant to Section 13(d) analysis.

34. <u>Phase Four – Parallel Financial Incentives</u>. Upon information and belief, a principal of Beermann LLP holds a financial interest in Schneider National, Inc. ("SNDR"), a publicly traded company in the same industry as Yeager Corp. Plaintiff pleads this allegation solely to support the inference of potential parallel economic incentives relevant to Section 13(d) materiality analysis. Plaintiff does imply any wrongdoing by SNDR.

**F.      The Structural Incompatibility of the State Forum**

35.      The Custody Matter is scheduled for trial in August 2026. Under Illinois law, custody proceedings are intended to be resolved expeditiously, and interim fee petitions under the Fee Statutes are adjudicated through summary procedures. Such procedural frameworks do not provide a vehicle for resolving the federal and securities-law issues raised in this action.

8                                                                                    *Yeager v. Steele*

36.     Plaintiff alleges that the state forum does not possess jurisdiction to adjudicate: (a) whether a federal Takings Clause injury has accrued; (b) whether the MSA waiver or trust instruments have been impaired for purposes of federal constitutional analysis; (c) whether Defendants' conduct gives rise to a statutory "Group" under Section 13(d) of the Exchange Act; or (d) whether federal disclosure obligations under Section 13(d) have been triggered.

**G.      History of Manipulation of the Domestic Relations Courts by Beermann LLP**

37.     Plaintiff alleges that Defendants' use of summary fee-turnover mechanisms in this matter is consistent with patterns of conduct described in other lawsuits involving the firm.

38.     In *Girard v. Village of Glencoe*, Civil No. 24-cv-06882 (N.D. Ill.), Chief Judge Rebecca Pallmeyer issued an opinion on August 12, 2025 (Dkt. 121), concluding that the plaintiff in that case had adequately pleaded a federal civil RICO claim against Beermann LLP for purposes of surviving a motion to dismiss. Applying the *Woodard* doctrine, the court held that the plaintiff could refile the claim upon termination of the underlying family-court matter.

39.     Plaintiff alleges that certain conduct described in the *Girard* record involved the use of specific firm personnel, including attorney Kurt A. Muller, in connection with fee-related proceedings in domestic-relations courts. Plaintiff alleges that the filings and procedural steps in this case share operational similarities with those described in *Girard*. These allegations are pleaded to support context and plausibility, not to assert that the *Girard* findings apply here.

40.     Plaintiff further notes that attorney Muller is the subject of an active disciplinary proceeding before the Illinois Attorney Registration and Disciplinary Commission ("ARDC"), Matter No. 2025PR00048, involving allegations of conduct prejudicial to the administration of justice. Plaintiff cites this public record solely to provide context for the allegations in this complaint. Plaintiff does not imply that the ARDC proceeding establishes liability in this case.

**9**                                                                        *Yeager v. Steele*

**H.      The Hallmarks of Beermann LLP Manipulation in the Custody Matter**

41.      Plaintiff alleges, upon information and belief, that counsel for Beermann LLP prepared a proposed order relating to the October 6, 2025 fee ruling and transmitted it to the court without contemporaneous service on Plaintiff or his counsel. Plaintiff suggests that the $30,000 surplusage of the order reflects a back-channel coordination with the state court.

42.      The Fee Statutes' use of mandatory ("shall") language and nonevidentiary procedures resulted in the court adjudicating the interim fee petitions without considering arguments regarding the MSA waiver or the independent nature of the Yeager Trusts. These allegations describe the procedural posture under which the fee petitions were resolved.

43.      Plaintiff further alleges that, during the Custody Matter, his counsel raised concerns regarding (a) the use of trust assets to measure Plaintiff's "ability to pay," (b) the court's rulings on motions to quash, and (c) the inappropriate application of financial-affidavit requirements. Such concerns were not addressed in written orders by the state court.

**I.      The So-Called "Beermann Motion for Fees Playbook"**

44.      Plaintiff alleges that the frequency and sequencing of fee-related filings in the Custody Matter are consistent with patterns described in publicly filed pleadings in other cases involving Beermann LLP. In *Girard v. Village of Glencoe*, the First Amended Complaint (Dkt. 73) described a pattern of multiple fee-related motions in domestic-relations proceedings.

45.      Plaintiff alleges that the Custody Matter has involved a substantial number of fee-related filings by Defendants Steele and Meyers, including motions for interim fees, turnover requests, and requests for financial sanctions. Plaintiff references the schematic appearing at pages 24–26 of the *Girard* First Amended Complaint (Dkt. 73), which summarizes fee-motion

frequency across a sample of Beermann LLP-involved domestic-relations cases, and alleges that the filing pattern in the Custody Matter is consistent with the trends described.

**Figure 1.** Statistics as to a cross section of Beermann LLP-involved family court cases.

| CASE NUMBER | PETITIONER | FILED | BEERMANN MOTIONS FOR FEES* |
|---|---|---|---|
| 2015D009633 | Girard | 10/20/15 | 11/6/23, 10/18/24** |
| 2020D001338 | Dean | 02/13/20 | 3/20/23 |

| CASE NUMBER | PETITIONER | FILED | BEERMANN MOTIONS FOR FEES* |
|---|---|---|---|
| 2022D007480 | Dobrowolski | 9/21/22 | 2/20/24, 5/17/24, 7/16/24 |
| 2009D011400 | Mintzer | 12/14/09 | 9/23/21,1/18/2, 2/1/22 |
| 2010D530906 | Gentile | 12/30/10 | 1/13/15, 2/19/19 |
| 2011D002375 | Par | 3/10/11 | 8/12/14, 7/28/21 |
| 2011D002738 | Johnsson | 3/18/11 | 8/7/14, 8/11/22 |
| 2014D008130 | Topalovich | 8/4/14 | 2/3/20, 10/13/20, 9/15/23, 9/23/24 |
| 2015D001383 | Griffin | 2/18/15 | 6/29/21, 2/25/22 |
| 2016D007956 | Paulish | 8/26/16 | 10/17/18, 5/17/23, 1/26/24 |
| 2021D002484 | Gamsjaeger | 3/24/21 | 2/16/22, 3/8/24 |
| 2021D002630 | Schwartz | 3/29/21 | 7/23/24 |
| 2021D008226 | Tyler | 9/23/21 | 12/20/21 |
| 2021D009225 | Lara | 10/25/21 | 6/21/24 |
| 2021D009833 | Tunney | 11/12/21 | 6/10/24 |
| 2022D001567 | Johnson | 2/28/22 | 6/24/24, 11/22/24 |
| 2020D003083 | Burkholder | 5/7/20 | 2/22/22, 3/8/22, 8/1/22, 11/17/22, 2/1/23 |
| 2020D006103 | Shah | 9/3/20 | 2/16/22, 8/9/22, 3/29/23, 4/21/23 |
| 2021D006964 | Samaniego-Skylas | 8/10/21 | 7/18/22, 11/22/22 |
| 2021D008999 | Szymulanski | 10/15/21 | 5/19/22, 3/13/23, 6/21/23, 11/14/23, 1/26/24, 2/5/24, 2/28/24, 3/20/24, 3/27/24, 5/30/24, 6/10/24, 9/23/24 |
| 2022D003274 | Funderbunk | 4/22/22 | 7/11/22 |
| 2022D004198 | Buss | 5/26/22 | 7/25/23 |
| 2022D004652 | Leonard | 6/13/22 | 10/27/23, 7/17/24 |
| 2023D006805 | Collins | 8/30/23 | 9/21/23 |
| 2023D008887 | Talarico | 11/13/23 | 5/15/24 |
| 2024D002817 | Kozlowski | 4/15/24 | 8/1/24 |

*Yeager v. Steele*

| 2023D006483 | MacMillan | 8/18/23 | 3/20/24, 4/22/24, 7/24/24 |
| 2022D002732 | Duckman | 4/5/22 | 12/28/22, 2/2/23, 4/26/24, 7/31/24, 8/20/24 |
| 2022D005505 | Kukadia | 7/14/22 | 5/25/23, 5/29/24 |
| 2022D008019 | Ennis | 10/11/22 | 11/2/22 |
| 2023D001284 | Pfaff | 2/16/23 | 12/4/23, 12/21/23, 1/16/24 |
| 2024D002754 | Cohen | 4/12/24 | 7/18/24, 11/7/24 |
| 2022D009505 | Sabel | 12/6/22 | 10/1/24 |
| 2021D000217 | Phelan | 1/11/21 | 8/9/21, 8/19/22, 10/12/22 |
| 2022D001981 | Hartman | 3/11/22 | 4/15/24, 5/10/24, 7/18/24 |
| 2022D004923 | Diamond | 6/22/22 | 12/13/23, 5/20/24 |
| 2024D079170 | Arias | 2/8/24 | 5/3/24 |

\*    The fee request is typically adduced in a self-described motion, petition or rule to show cause; requests for final assessment of fees post-decree are specifically not included in this itemization.

\*\* Indicates a fee motion was pronounced as forthcoming on the inscribed date.

46.    Plaintiff quotes the following allegations from the *Girard* First Amended Complaint (Dkt. 73) for contextual comparison only:

84.    Examination of forty (40) random family law proceedings in Cook County in which Beermann LLP has represented one of the parties has revealed that in 92% of such proceedings Beermann LLP has propounded at least one motion15 for attorneys fees separate and apart from the praecipe for outstanding fees owing which accompanies entry of judgment.

85.    On average, per this examination, Beermann LLP propounds 2.5 motions for fees per proceeding not counting the praecipe. Such numbers constitute absolutely stunning statistics because for the vast majority of the sample tested the inceptive date of the proceeding is not more than four years ago.

86.    Post-decree proceedings can linger for a decade or more (as evidenced by Gentile, Par and Johnsson in the sampled data). Accounting for the time remaining on the clock, chances are the average number of motions for fees for this very sample will be much higher in five years and the hit rate will likely be much closer to 100%. This empirical pattern speaks volumes in support of the prevalence of the Beermann Motion for Fees Playbook.

47.    Plaintiff alleges that, to date, he has received at least fourteen (14) separate filings from Beermann LLP in the Custody Matter seeking interim fees, turnover of funds, financial

**12**                                                                                    *Yeager v. Steele*

information, or monetary sanctions. Plaintiff pleads this allegation to describe the procedural history and filing frequency in the Custody Matter.

**J.      A Pattern of Jurisdictionally Significant Conduct**

48.     Plaintiff alleges that Beermann LLP frequently represents clients in domestic-relations matters involving complex or extensive asset structures. Plaintiff further alleges that, in such matters, the firm's filings often include financial assessments that attribute third-party held assets to opposing parties (as is true for many of the cases in Figure 1 *supra*).

49.      For example, in *Girard v. Paige*, Civil No. 26-cv-1443 (N.D. Ill.), and *Girard v. Girard*, Civil No. 26-cv-1339 (N.D. Ill.), Beermann LLP engaged in filing practices that resulted in state-court proceedings continuing during periods when removal to federal court had been invoked, calculated to beat the clock on the children attaining majority. Plaintiff cites these matters to show that similar procedural issues have been raised elsewhere.

50.     In *Girard v. Girard*, District Judge Jeremy C. Daniel issued an opinion on April 2, 2026 (Dkt. 59), rejecting the argument that a Notice of Removal constituted a "nullity." Plaintiff cites this ruling solely to show that federal courts have addressed removal-related arguments involving Beermann LLP in other matters.

51.     The procedural patterns described in the *Girard* matters, and Girard's extensive real estate portfolio held by third party corporations, provide contextual support for the injuries *sub judice*. Plaintiff does not assert that the *Girard* rulings establish liability in this case.

52.     Plaintiff alleges that, in the Custody Matter, the sequence of fee-related filings and resulting orders had the effect of requiring payments directly to Beermann LLP. Plaintiff further alleges that these filings, taken together, reflect coordinated actions by the Defendants that

13                                                                                      *Yeager v. Steele*

affected Plaintiff's financial posture. These allegations are pleaded solely to describe the procedural history and asserted coordination among Defendants.

53. Plaintiff alleges that Defendants' use of the Fee Statutes' nonevidentiary procedures, combined with the presentation of financial summaries, resulted in interim fee determinations being made without consideration of Plaintiff's arguments regarding the MSA waiver or the independent nature of the Yeager Trusts. Plaintiff pleads these allegations to describe the procedural posture under which the fee petitions were adjudicated.

54. Plaintiff alleges that the First Judicial Taking order, and any future order based on similar financial-attribution principles, had the effect of requiring Plaintiff to satisfy obligations based on trust-held assets. Plaintiff further alleges that the enforcement mechanisms associated with such orders could result in financial consequences for Plaintiff and the Yeager Trusts.

**K. Alleged Joint Activity and Securities-Law Implications**

55. Plaintiff alleges that Defendants' use of the Fee Statutes' enforcement mechanisms resulted in orders requiring payments directly to Beermann LLP. Plaintiff further alleges that the financial-attribution framework applied in the Custody Matter created a procedural posture in which trust-held assets were treated as part of Plaintiff's personal liquidity. Plaintiff pleads these allegations to support the assertion that Defendants acted jointly with state-court processes for purposes of 42 U.S.C. § 1983.

56. Plaintiff alleges that the combination of nonevidentiary procedures under the Fee Statutes and the presentation of financial summaries resulted in interim fee determinations being made without consideration of Plaintiff's arguments regarding the 2021 MSA waiver or the independent nature of the Yeager Trusts.

*Yeager v. Steele*

57.     Plaintiff alleges that the interim fee orders in the Custody Matter were based on an attribution of trust-held assets to Plaintiff personally and that non-payment of such orders could result in contempt sanctions.

58.     Plaintiff alleges that Defendants Sochor, D'Arco, Steele, Meyers, and Beermann LLP acted in a coordinated manner with respect to filings and enforcement actions that could affect trust-held Yeager Corp securities. Plaintiff alleges that this coordinated conduct reflects a "control person" configuration under Section 20(a) of the Exchange Act and supports the inference of a statutory "Group" under Section 13(d)(3).

59.     Plaintiff alleges that each Defendant held a distinct role within this alleged alignment: Defendant Sochor sought fee-related relief that implicated trust-held securities, while the Beermann Defendants pursued turnover mechanisms under 750 ILCS 5/508(a) that, if enforced, could require liquidation or transfer of trust-held Yeager Corp shares. Plaintiff alleges that the aggregate effect of these actions implicates the 5% threshold under Section 13(d).

60.     Plaintiff alleges that Defendants' filings did not disclose to the state court the conversion mechanics applicable to certain Yeager Corp shares under the company's Certificate of Incorporation. Plaintiff alleges that, as a result, the court was not presented with information regarding the potential corporate-governance consequences of a compelled transfer of trust-held shares. These allegations are pleaded to support the securities-law claims asserted in this action.

61.     Plaintiff alleges that, under the Yeager Corp Certificate of Incorporation, a transfer of certain trust-held shares to a non-permitted transferee triggers a conversion mechanism that alters the voting characteristics of those shares. Plaintiff alleges that such a conversion would reduce the voting concentration associated with the trust-held block and could result in irreparable harm to the issuer's governance structure.

*Yeager v. Steele*

**L.** **Alleged Use of State-Court Procedures for Non-Custody-Related Objectives**

62. Plaintiff alleges that Defendants Steele and Sochor acted in a coordinated manner in the Custody Matter and that their coordinated filings had effects extending beyond the immediate custody issues. Plaintiff further alleges that this coordination influenced the sequence and nature of filings presented to the state court, in support of §1983 joint-action.

63. Plaintiff alleges that, on February 3, 2026, the state court permitted the deposition of Plaintiff's mother. The questioning addressed topics not directly related to custody issues – including relating to her personal whereabouts on specific dates – and the deposition's scope reflected the coordinated litigation posture of Defendants Steele and Sochor. Plaintiff pleads these allegations solely to describe the procedural history of the Custody Matter.

64. Plaintiff alleges that the combination of private filings and state-court enforcement mechanisms resulted in a procedural posture in which private requests were enforceable through judicial processes. Plaintiff pleads these allegations to support the assertion that private conduct and state-court procedures operated jointly for purposes of §1983 analysis.

65. Plaintiff further notes, in *IRMO Ivankovich*, Cook County Case No. 2021-D-9220, a $70,000 sanction was imposed on a Beermann LLP partner. In that order, Judge Flannigan stated that the attorney had engaged in "tactical deception" and exhibited a "blatant disregard of the law," and directed that he "reconsider [his] oath." Plaintiff cites this record solely to provide background and does not allege that the *Ivankovich* sanction establishes liability in this case.

**M.** **Beermann's Discovery Abuses Allowed by the State Court**

66. In the past several months, Sochor's legal team served Plaintiff with around seventy-five (75) requests for production. Setting aside that Ill. S. Ct. R. 214 limits such requests to being "reasonable in scope and relevant to the subject matter of the action", an examination of the requests quickly reveals the **Beermann Motion for Fees Playbook** in full color here.

16                                                                                      *Yeager v. Steele*

67.     Indeed, on May 18, 2026, Attorney Steele propounded a motion to compel discovery responses notably seeking more information 45 of the issued requests, of which 18 dealt with financial disclosures – completely unrelated to the topic of custody determination, and transparently abusive given the division of property was permanently settled in 2021.

68.     A closer look at those requests demonstrates that of the seventy-five (75) enumerated requests for production propounded by Attorneys Steele and Meyers, no more than fifteen (15) requests bear any legitimate probative relationship[2] to the sole subject matter of the Custody Matter — the fitness of the parties as parents and the best interests of the child GY.

69.     The remaining sixty (60) requests — comprising 80% of the total discovery demand — systematically target Plaintiff's financial architecture, the Yeager Trusts, tax controversies (IRS Forms 4549-A, 886-A, 5278), partnership interests, personal vulnerability profile, real estate and securities holdings. This is not aggressive advocacy; it is a forensic mapping of the exact asset structure Defendants have targeted for liquidation in the parallel fee petition proceedings, deployed via the discovery powers of the state court as a Trojan horse.

70.     Indeed, the state court struck a small number of the issued discovery requests notably however without imposing discovery abuse sanctions under Ill. S. Ct. R. 219 and furthermore without questioning the underlying purpose in the broad discovery dragnet.

71.     Defendant Sochor filed multiple broad motions seeking to quash subpoenas and restrict discovery, including: (a) *Motion to Quash Third-Party Subpoenas and for Protective Relief, with Requests for Fees under 750 ILCS 5/508(b)* (Nov. 8, 2025); (b) *Motion to Quash Subpoena to Minor Child's LCSW, for Protective Relief, and for Sanctions* (Dec. 15, 2025); and

---

[2] One striking example is Request No. 58 which asks for copies of **all subpoenas and discovery requests issued by Plaintiff**. Thereby, Attorney Steele is using the discovery process to inventory Plaintiff's own litigation strategy. That is not custody discovery. Such constitutes competitive intelligence gathering in an ongoing legal war.

17                                                                          *Yeager v. Steele*

(c) *Supplemental Motion to Quash "Amended" Subpoena to Minor Child's Therapist and for Other Protective Relief* (Dec. 22, 2025). Each of these motions was substantially granted.

72. By contrast, Plaintiff filed two narrowly tailored motions seeking only to limit the scope of his own discovery deposition (Feb. 10, 2025 and Mar. 6, 2025). Both motions were denied. When Plaintiff's counsel sought clarification regarding the basis for the differential treatment, the state court provided no explanation.

73. Plaintiff subsequently filed multiple motions to reconsider, seeking restoration of parity in discovery administration. These motions were also denied, including via the state court's order entered on April 17, 2026.

74. Additional disparities occurred in the administration of discovery stays. The state court stayed Plaintiff's ability to issue discovery on several occasions (e.g., order dated Aug. 5, 2024), while never imposing comparable limitations on Defendant Sochor's discovery issuance.

75. On April 27, 2026 Defendant Sochor's legal team filed their *Respondent's Reply in Support of her Third Petition for Interim/Temporary Attorneys' Fees and Costs*. Pages 15-16 are extraordinary, wherein Attorney Steele explicitly argues:

> Matthew's $1 million-plus compensation, $1.36 million Fidelity brokerage account, approximately $772,000 Roth 401(k), approximately $3.1 million in real estate equity, [Yeager Corp] stock and RSUs, family/trust structures, and beneficial trust interests are described as constrained, inaccessible, or irrelevant.

And then on Schedule C he references trusts with distribution provisions permitting payments to Matthew *"for broad purposes including health, support, maintenance, education, welfare, and best interests."* This paper documents the exact mechanism utilized for the asset grab.

## N. Asymmetric State Court Posture Across Categories

76. Although financial affidavits are specifically not statutorily required in post-decree proceedings, Attorney Meyers issued such a request to Plaintiff on April 22 2025 and

*Yeager v. Steele*

the state court ** immediately ** ordered an evidentiary hearing about the fees on May 2, 2025.

77.     Similarly, the court allowed Attorney Meyers to issue a rule to show cause against Plaintiff on May 16, 2025 for indirect civil contempt for failure to complete the (non-required) financial affidavit. By contrast, Plaintiff's requests to probe Sochor's 401K and details of her employment and bonus compensation have not been sustained by the state court.

78.     Separately, Defendant Sochor manufactured a 911 call before the dissolution decree was finalized in 2021 in which she complained that Plaintiff had broken a window of her residence.  Her deposition testimony taken on March 17, 2026 confirms that the entire incident was manufactured to establish unmerited leverage in the division of marital property.

79.     Indeed, upon a closer examination, there were myriad problems with her criminal complaint: the residence actually belonged to Plaintiff, and there was no broken window. Instead, a small glass pane in the foyer was "spider cracked". The case was dismissed and under the Illinois Rules of Evidence the entire anecdote is inadmissible.

80.     Despite the well-established procedural guardrails known to all judges in Illinois against impeaching a party with a non-conviction, the state court has repeatedly refused to reprimand, sanction or strike more than two dozen papers filed in the Custody Matter by Attorneys Steele and Meyers making bold mention of the matter.

81.     Elsewhere, Plaintiff moved for the appointment of a Custody Evaluator under 750 ILCS 5/604.10(b) in a motion filed with the state court on February 23, 2026. The motion relied on substantial reasoning e.g. that Sochor had established a pattern of disparaging GY in her presence and Sochor had pushed aggressively to force GY to repeat kindergarten, although the principal of GY's school confirmed that holding her back was not in her best interests.

82.     The state court denied the motion to appoint a Custody Evaluator under the theory

*Yeager v. Steele*

that it would unnecessarily increase the cost of the litigation. The reasoning is flawed, however, given the fee grants it had already approved and the aggregate fees incurred already measuring ~ $1.5 million. Typical Custody Evaluator reports generate billings of around $50,000 (see for example the billings of Custody Evaluator Phyllis Amabile under the *Girard* custody docket).

83. The denial of the 604.10(b) motion is consistent with the broader pattern of asymmetrical rulings described above. Despite the substantial fees already incurred and approved, the court declined to authorize a standard evaluative tool routinely used in custody matters, even where the record reflected significant disputes regarding the child's best interests.

**O. Evidence of Child Endangerment Ignored and Manufactured**

84. Despite being read into multiple incidents in which the minor child GY experienced near-death experiences while in the exclusive custody of Defendant Sochor (including head trauma and eye trauma, to the point of requiring surgery), the state court-appointed Guardian Ad Litem in the Custody Matter – David Sternfield from Davis Friedman, LLP – has ignored those unambiguous warning signs.

85. Instead, per his report dated May 29, 2026, Mr. Sternfield recommends for Plaintiff to undergo "neuropsychological examination to allow the Court to better understand his behavior" and recommends the ex-wife to acquire **sole decision making authority** as to GY.

86. The same pattern has been observed with the nominally independent child counselor selected by Ms. Sochor, Mackenzi Maples from Birch Forest Children's Therapy Center. For example, per her deposition testimony given on June 1, 2026 she "diagnosed" GY with a psychological disorder after a single intake discussion with Sochor notably without meeting GY. She further admitted to not employing any DSM criteria (standardized guidelines used to diagnose mental disorders) in establishing her written "diagnosis" of GY.

20                                                                    *Yeager v. Steele*

87.     Ms. Maples also testified that she could not recall how many of her child-therapy referrals originated from Beermann LLP[3], despite having joined Birch Forest only in 2024. She further confirmed that Birch Forest proceeded under the assumption that Defendant Sochor's allegation of early-childhood exposure to domestic violence was true, and made no effort to verify the allegation before preparing a treatment plan.

88.     The assumption of unverified abuse allegations has appeared repeatedly in filings submitted by Defendant Sochor's counsel. For example, in a motion for partial  summary judgment filed on February 19, 2026, counsel characterized Plaintiff as aggressive, abusive, and a danger to GY, relying in part on the unverified findings described above.

## COUNT I - VIOLATION OF THE TAKINGS CLAUSE
### *42 U.S.C. § 1983 - All Defendants*

89.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

90.     Plaintiff possesses a legally recognized property interest as a designated beneficiary of the Yeager Trusts. This includes the protection of the trust corpus through a spendthrift clause, which bars external creditors from reaching trust principal.

91.     This claim is ripe under *Pakdel v. City and County of San Francisco*, 594 U.S. 474 (2021), because the state court has taken a definitive position: (1) the "First Judicial Taking," and (2) the active June 10, 2026 scheduling order under threat of incarceration. These actions collectively establish a final state determination sufficient under *Pakdel* and related authority.

92.     Under the judicial-takings framework articulated in *Stop the Beach Renourishment, Inc. v. Florida DEP*, 560 U.S. 702 (2010), and reinforced by *Knick v. Township of Scott*, 588 U.S. 180 (2019), a taking occurs when state authority (1) eliminates an established

---

[3] Incidentally, in the deposition of Defendant Sochor taken on March 17, 2026 – like Ms. Maples – she could not recall how she happened to find or was referred to Birch Forest Children's Therapy Center.

21                                                                                      *Yeager v. Steele*

private property right, and (2) effects a transfer of that property. The transfer need not pass through the public domain; the coercive mechanism itself may constitute the transfer.

93.     This two-step structure[4] aligns with *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980), and *Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998). In *Webb's*, the Court held that a state may not, by *ipse dixit*, convert private property into public property. In *Phillips*, the Court confirmed that interest generated on client funds remained private property regardless of state attempts to recharacterize it. State-driven reclassification of private assets constitutes a taking when it extinguishes vested rights and redirects the property.

94.     Applied here, Defendants jointly operated this prohibited structure. Step One occurred when the state court treated independent trust assets as Plaintiff's personal liquidity. Step Two occurred when the court deployed the threat of incarceration in June 2026 to compel payment of substantial sums, forcing liquidation of trust assets to satisfy those obligations.

95.     The presentation of the First Judicial Taking — and set to repeat on June 10, 2026 — does not involve a direct order to the trust. Instead, the state court orders Plaintiff to remit funds *instanter* under penalty of contempt. The coercive mechanism is the state's incarceration power, sufficient to satisfy the governmental-nexus requirement of the Takings Clause. The order effectively compels the Yeager Trusts to liquidate assets to prevent Plaintiff's incarceration.

96.     Conditioning Plaintiff's liberty on the liquidation of independent trust principal constitutes a regulatory taking of private property without just compensation.

97.     By reinterpreting "ability to pay" to include assets Plaintiff does not own, the state has authorized the seizure of private trust wealth to satisfy obligations arising from litigation to

---

[4] Not all judicial transfers of property from Private Party A to Private Party B can be decomposed into this two-step sequence. In a routine dispute, a court merely adjudicates competing private claims; the property is never absorbed into the State's control.

*Yeager v. Steele*

which the trust is not a party. This constitutes a taking of third-party beneficiary property without compensation, in violation of the Fifth and Fourteenth Amendments.[5]

## COUNT II - VIOLATION OF PROCEDURAL DUE PROCESS
### *42 U.S.C. § 1983 - All Defendants*

98.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

99.     Procedural Due Process protects Plaintiff's right to fair procedures before the state deprives Plaintiff of property or liberty. By converting unverified allegations into an irrebuttable presumption of personal wealth and by proceeding without an evidentiary hearing, the state court deprived Plaintiff of a meaningful opportunity to contest the basis for the orders at issue.

100.     Under *Mathews v. Eldridge*, 424 U.S. 319 (1976), the amount of process required depends on three factors: (1) the private interest affected; (2) the risk of erroneous deprivation under the procedures used, and the probable value of additional safeguards; and (3) the government's interest, including administrative efficiency.

101.     Plaintiff's private interest is substantial. The orders at issue directly affect Plaintiff's ability to maintain voting control over a multi-billion-dollar corporation and expose independent trust assets to liquidation. These are significant property and liberty interests. A family court is not structurally equipped to evaluate federal securities-law implications, including "group" formation, beneficial-ownership shifts, or the consequences of compelled liquidation on federal reporting obligations. Any state interest in administrative efficiency is outweighed by the federal interests implicated and by the magnitude of the private interests at stake.

## COUNT III - VIOLATION OF SUBSTANTIVE DUE PROCESS
### *42 U.S.C. § 1983 - All Defendants*

102.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

---

[5] Pursuant to *Tyler v. Hennepin County*, 598 U.S. 631 (2023), the state cannot use its statutory machinery to extract property values exceeding what is legitimately owed.

**23**                                                                                    *Yeager v. Steele*

103. The Fourteenth Amendment's Substantive Due Process Clause prohibits state actors from engaging in arbitrary, capricious, or irrational exercises of sovereign authority that infringe upon fundamental liberty interests or vested property rights.

104. A Substantive Due Process violation is established where (a) the challenged state action is arbitrary or irrational, and (b) the deprivation is not adequately remedied by state procedures or is accompanied by an independent constitutional violation. Plaintiff satisfies this standard because the actions at issue lack a rational basis and impute no legitimate state interest.

105. The state court is poised to repeat the same asset-reclassification mechanism used during the First Judicial Taking on June 10, 2026. Recharacterizing independent trust assets as lacks any connection to the facts, the governing trusts, or established property law principles.

106. The use of sovereign contempt powers to compel liquidation of trust principal constitutes an arbitrary and conscience-shocking exercise of state authority. Deploying incarceration as a mechanism to force a transfer of private trust assets to a private law firm — assets to which the firm has no legal claim — falls outside the bounds of judicial power.

107. Conditioning Plaintiff's liberty on the destruction of his daughter's and other beneficiaries' vested inheritance, and on the forced alteration of Yeager family voting control, constitutes an abusive and irrational use of judicial authority. Such conduct violates the core protections of the Substantive Due Process Clause.

**COUNT IV - VIOLATION OF THE CONTRACT CLAUSE**
*42 U.S.C. § 1983 - All Defendants*

108. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

109. The Contract Clause prohibits states from impairing existing contractual obligations through legislative or judicial action. A judicial decision violates the Clause when it alters established contractual rights without serving a legitimate and significant public purpose.

24                                                                                    *Yeager v. Steele*

110.     To state a Contract Clause claim, a plaintiff must show: (1) the existence of a contractual relationship; (2) a change in state law or its application that substantially impairs that relationship; and (3) that the impairment is not reasonable to serve a legitimate public purpose.

111.     Plaintiff has vested contractual rights under (a) the 2021 Marital Settlement Agreement[6], and (b) the irrevocable trust instruments[7] governing the Yeager Trusts. These instruments constitute binding contracts that define asset preservation, distribution rights, and spendthrift protections. Plaintiff relied on these contracts in forming his investment-backed expectations. See *Sveen v. Melin*, 584 U.S. 811 (2018).

112.     The application of the Fee Statutes in the Custody Matter substantially impairs these contractual relationships. By treating independent trust assets as Plaintiff's personal marital liquidity, the state court's orders require the Trustees to disregard explicit spendthrift provisions and to reclassify protected trust principal as available for litigation expenses. The anticipated Second Judicial Taking would replicate this impairment.

113.     No significant or legitimate public purpose justifies impairing a five-year-old MSA or overriding the terms of irrevocable trust instruments to redirect private trust assets to a private law firm. The impairment would diminish the trust estate, disrupt the settlor's intent, and alter vested beneficiary rights without serving any discernable public objective.

### COUNT V - VIOLATION OF THE EXCHANGE ACT SECTION 13(D)
*17 C.F.R. § 240.13d-5 – All Defendants*

114.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

115.     Section 13(d)(3) of the Exchange Act and SEC Rule 13d-5(b)(1) provide that when two or more persons agree to act together for the purpose of acquiring, holding, or

---

[6] Even the Illinois Appellate Court recognizes this principle in action. In its ruling under *IRMO Johnston*, 2014 WL 5460610 (Ill. App. Ct.), a court cannot modify or override contractual property-settlement terms in an MSA unless the statute expressly authorizes it. The Appellate Court cited Contract Clause principles and held that judicial modification of a private MSA is constitutionally constrained.

[7] Trust agreements are contracts among the settlor, trustee, and beneficiaries.

**25**                                                                                              *Yeager v. Steele*

disposing of equity securities of an issuer, they are deemed a single "person" and form a statutory "Group." A formal agreement is not required; a group may be inferred from coordinated conduct, shared incentives, and parallel actions toward a common control objective.

116. The independent, non-party Yeager Trusts collectively hold approximately 62.2% of the voting float of Yeager Corp, a publicly traded company. Defendants' actions target the compelled liquidation or disposition of this voting block, which far exceeds the 5% threshold that triggers mandatory disclosure under the Williams Act.

117. The Beermann Defendants are not acting solely as legal representatives of Defendant Sochor. The record reflects coordinated conduct consistent with a voluntary, implied-in-fact commercial alignment to act in concert with respect to the disposition of Yeager Corp equity securities held by the Yeager Trusts. This includes the use of Fee Statutes to obtain a direct, non-contingent financial interest in the voting block, and the coordinated timing and sequencing of fourteen (14) filings that coincided with Yeager Corp earnings adjustments and market-sensitivity periods. These allegations support a plausible inference of a shared control purpose sufficient to constitute a statutory "Group" under Section 13(d)(3) and Rule 13d-5.

118. Despite acting in concert with respect to the acquisition, holding, or disposition of more than 5% of Yeager Corp's voting securities, Defendants have not filed a Schedule 13D or disclosed their coordinated control purpose, group composition, or financial interests to the SEC or the investing public. This omission violates the disclosure requirements of the Williams Act.

119. Pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, this Court has exclusive jurisdiction over this claim and authority to issue injunctive relief to prevent further undisclosed group activity affecting the capital structure and voting control of Yeager Corp.

*Yeager v. Steele*

## COUNT VI – COMMON LAW TORTIOUS INTERFERENCE WITH CONTRACT
### 28 U.S.C. § 1367(a) – *All Defendants*

120.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

121.    A claim for tortious interference with contract requires showing: (1) the existence of a valid/enforceable contract; (2) the defendant's knowledge of that contract; (3) intentional and unjustified inducement of a breach; (4) a resulting breach or disruption; and (5) damages.

122.    Plaintiff possesses valid contractual rights under the 2021 Marital Settlement Agreement, including Defendant Sochor's express waiver of any claim to the Yeager Trusts. Plaintiff also possesses enforceable contractual rights as a beneficiary under the irrevocable Yeager Trust instruments.

123.    Defendants had actual knowledge of these contracts, including the MSA's trust-waiver provision and the terms of the trust agreements governing the Yeager Trusts.

124.    Defendants intentionally engaged in conduct that induced disruption of these contractual relationships. This includes litigation actions directed toward treating trust assets as Plaintiff's personal property, notwithstanding the contractual waiver and the spendthrift protections contained in the trust instruments.

125.    By invoking summary procedures that foreclosed evaluation of the MSA waiver and by seeking orders that placed Plaintiff at risk of contempt unless trust assets were liquidated, Defendants caused disruption of contractual rights. This interference lacked legal justification because it required disregarding the contractual waiver and the terms of the trust instruments.

126.    As a direct and proximate result of the interference, Plaintiff has suffered financial harm, including costs associated with compelled liquidation pressures, litigation expenses, and impairment of contractual rights. Plaintiff also seeks recovery for consequential damages recognized under Illinois law. See Illinois tortious interference damages.

**27**                                                                                   *Yeager v. Steele*

**WHEREFORE**, Plaintiff prays this Court grant the following relief:

A.      Prospective Injunctive Relief (Count V — Exchange Act § 13(d))

Pursuant to Section 27 of the Securities Exchange Act of 1934 and controlling Seventh Circuit authority, including *Edelson v. Ch'ien*, 405 F.3d 620 (7th Cir. 2005), enter preliminary and permanent injunctive relief enjoining Defendants, their agents, and all persons acting in concert with them, from taking any further steps to compel, induce, or effect the liquidation, transfer, or disposition of equity securities of Yeager Corp held by the Yeager Trusts, unless and until Defendants file a complete and accurate Schedule 13D with the Securities and Exchange Commission disclosing any coordinated control purpose, group composition, and acquisition or disposition objectives.

B.      Compensatory & Punitive Damages (Counts I, II, III, IV, and VI)

Award compensatory damages in an amount to be determined at trial for injuries arising from Defendants' conduct, including financial harm, impairment of contractual rights, and other legally cognizable damages.

Award punitive damages against the individual Defendants, in an amount to be determined at trial, to the extent permitted under applicable law.

C.      Fees and Costs

Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable statutory authority.

D.      Additional Relief

Grant such other and further relief as the Court deems just and proper.

Dated: **June 3, 2026**                           Respectfully submitted,


                                                  /s/ Matthew D. Yeager, In Pro Se
                                                  1047 Hickory Drive
                                                  Western Springs, IL 60558
                                                  Email: matthewyeager2024@gmail.com
                                                  Tel: (630) 862-1123


*Yeager v. Steele*