BC

FILED
8/22/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

EE

**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MATTHEW D. YEAGER, | |
| Plaintiff, | Civil No. 1:26-cv-06793 |
| v. | District Judge Sharon Johnson Coleman |
| JONATHAN D. STEELE et al., | **EMERGENCY EX PARTE MOTION FOR TRO** |
| Defendants. | |

Plaintiff Matthew D. Yeager for his Emergency Ex Parte Motion for Temporary Restraining Order states as follows: Rule 65(b) provides that the Court may issue an ex parte temporary restraining order where immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition. Such a scenario has presented, and Plaintiff hereby seeks the Court's help as a result.

## INTRODUCTION

Plaintiff is an executive of a NASDAQ-listed company ("Yeager Corp") which was founded by his grandfather. The unique aspect of the governance and control structure is that the Yeager Family maintains its posture by holding 62.2% of the voting B shares in a series of irrevocable trusts ("Yeager Trusts"). The Yeager Trusts were established to maintain control within the bloodline of the founder, and Plaintiff is just one of about a dozen beneficiaries. Notably Plaintiff's six-year-old daughter  is one of the beneficiaries, and the asset stripping effected by Defendants in this matter squarely victimizes the minor child and her financial future.

The B shares are subject to an automatic conversion clause, wherein any sale or transfer of the B shares immediately and irrevocably converts them to A shares and 95% of the voting power is destroyed. Interfering with the B shares is serious business: **there is no mechanism to**

**undo or repatriate the destruction of voting power.**

The spark for the filing of the instant suit was Defendants' unabashed co-opting of the Cook County Domestic Relations Division[1] as an instrumentality to launch an UNDISCLOSED control structure attack against Yeager Corp, wherein they have successfully persuaded the state court to ledger the **entire asset pool** of the Yeager Trusts during the course of three successive fee petitions (with no end in sight). The statutory hook Defendants have exploited in order to achieve these ill ends consists in repeated application of the so-called "Leveling the Playing Field" fee statutes codified under 750 ILCS 5/508(a), which under the plain text of the statute are supposedly limited to fee requests during a dissolution of marriage proceedings.

Not only is the use of the fee statutes for interim fee capture disallowed for a proceeding not under the Illinois Marriage and Dissolution of Marriage Act ("IMDMA") such as this federal action, but even more concerning is that Plaintiff's marriage was dissolved in 2021 and Defendant Sochor **contractually agreed never to assert or pursue any adverse interest in the Yeager Trusts** as part of the negotiations of property division under the 2021 Marital Separation Agreement ("MSA"). The state court has thereby abrogated a judicial estoppel. No matter, Defendants have quarterbacked the family court proceedings to apply those fee statutes to the underlying post-decree proceedings with equal effect.

This ledgering of the assets held by the Yeager Trusts – which consist in the B shares of Yeager Corp – is deeply troubling on multiple levels, as detailed in the complaint. First, referencing a third party asset pool over which Plaintiff has no control to calibrate his personal

[1] Plaintiff is at issue in post-decree proceedings in the family court ("Custody Docket") concerning parenting time allocation as to his six-year-old daughter; the dissolution of marriage and accompanying division of property with his ex-wife, Defendant Pamela Sochor, was perfected in 2021.

ability to pay implicates serious constitutional deprivations directed squarely at Plaintiff[2]. Second, each time the family court accedes to Defendants' fee petition requests – which have been increasing in magnitude at an alarming rate from fee grants of ~$20K under the first petition to ~$95K under the second petition to ~$180K under the third fee petition, all in the space of the last 18 months – she forces the trustees of the Yeager Trusts to choose between the freedom of a critical Yeager Corp executive (Plaintiff) and permanently destroying voting power in the Yeager Trusts by liquidating B shares.

**THE NATURE OF THE EMERGENCY**

Defendants have taken their control structure attack against Yeager Corp to a new level. Pursuant to a **fourth petition for fees** under the same fee request framework highlighted *supra* – codified under pursuant to 750 ILCS 5/508(a)(a-5) and 750 ILCS 5/508(a)(6) – filed in the underlying state custody docket (**Exhibit 2**), Attorney Elster seeks attorneys fees incurred by defense of Defendants **IN THIS FEDERAL SUIT** and the family court has set a court date of September 8, 2026 to approve that request.

At the threshold, Plaintiff has an absolute, unfettered right to file a federal lawsuit under the Petition Clause of the First Amendment. The family court cannot operate a toll-booth in front of the doors to this District Court, as will be examined in further detail *infra*. This federal fee request IN THE STATE COURT is nothing short of an assault on comity. Furthermore, the attempt to obtain federal fees in state court raises Supremacy Clause concerns because it seeks to impose a state-law burden on the exercise of federal rights and interferes with this Court's exclusive authority to adjudicate the federal claims. Attorney Elster knows better, furthermore,

[2] Under the Motion to Dismiss, Defendants advance the strawman argument that Plaintiff cannot sue on behalf of the Yeager Trusts, under Illinois law. Plaintiff does not disagree: the underlying action is rather concerned with the violation of Plaintiff's constitutional rights, for which he unquestionably has standing.

because he is admitted to practice before SCOTUS.

Furthermore, Attorney Elster's interposition into the underlying custody docket runs afoul of his sworn declaration under the recent Motion to Disqualify Beermann LLP as Counsel for Pamela Sochor, in which he stated in relevant part that he is ** not involved ** in the Custody Docket[3]. See ECF 14 at 17 at ¶ 4.

Even from the perspective of Illinois Law, the petition filed by Attorney Elster is meritless. Section 508(a)(6) permits fee awards for "ancillary litigation incident to, or reasonably connected with" domestic-relations proceedings. Federal claims under § 1983 and the Securities Exchange Act are not ancillary to custody litigation. They arise under federal law, involve federal standards, and fall within exclusive federal jurisdiction. The fee petition's theory – that federal civil-rights and securities claims are "ancillary" to a domestic-relations docket – has no support in Illinois law, federal law, or the structure of the IMDMA.

Under their Motion to Dismiss Defendants have attempted to excuse their conduct as ordinary fee capture in a family court proceeding, in which they have specifically not acquired shares[4] of Yeager Corp (ECF 17 at 11). The landmark case in which group formation and intent under the Exchange Act is explained is *SEC v. Drexel Burnham Lambert, Inc.*, 837 F. Supp. 587

[3] Plaintiff reserves his right to seek a renewed application for disqualification of Attorney Elster as counsel for Defendant Sochor based on these new disqualifying circumstances. As Plaintiff outlined in his previously denied Motion to Disqualify, the Seventh Circuit recognizes that when counsel is a necessary witness because of their involvement in another matter substantially related to the present litigation, their continued participation taints the record itself. See *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d at 721. Structural taint affects the framing of pleadings, the shaping of discovery, the assertion of privilege, the selection of legal theories, the presentation of evidence, and the strategic posture of the case. Once structural taint enters the record, it cannot be surgically removed. The only remedy is early disqualification.

[4] Moreover, Defendants materially distort the holding under *Edelson v. Ch'ien*, 405 F.3d 620 (7th Cir. 2005). *Edelson* does not contradict *Drexel Burnham* because *Edelson* deals with remedies and standing, not the definition of "acquisition." *Drexel Burnham*'s rule — that plans, arrangements, or coordinated actions can constitute an acquisition requiring disclosure even without taking title — remains fully intact and untouched by *Edelson*.

(S.D.N.Y. 1993). Pursuant to that ruling, under Section 13(d) an "acquisition" is not limited to taking title to shares — the formation of plans, arrangements, or understandings to obtain or influence control *is itself* an acquisition requiring disclosure, demolishing any claim that the absence of formal share ownership leaves a party free and clear.

When a state court is poised, as here, to impose a penalty, burden, or coercive consequence tied to the filing or prosecution of federal claims, and the imposition is scheduled to occur before ordinary briefing can be completed, the constitutional injury is imminent and time-critical. In parallel, Defendants are using the very same fee statute to suppress Plaintiff's vigorous advocacy and this Court's inquiry in their undisclosed control structure attack against Yeager Corp. If granted, more B shares would be liquidated causing further damage to the voting float. Structural constitutional injuries cannot be remedied after the fact, and federal access cannot be taxed. **This is an emergency-level concern.**

**THE HISTORY OF STATE COURT FEE AWARDS**

Plaintiff appears *pro se* in this proceeding precisely because his financial resources are finite and have been substantially depleted under the Custody Docket. As noted by Defendants under their state court motion for federal fees, they have received a sequence (~$20K, then ~$95K and most recently ~$180K) of aggressively increasing fee awards under the cover of "Leveling the Playing Field". The state-court record under the Custody Docket demonstrates that the sequential fee petitions are premised on an assessment of Plaintiff's "ability to pay" which expressly incorporates assets held by independent third-party trusts (the Yeager Trusts – see complaint at ¶¶1,3) over which Plaintiff has no ownership or control.

The complaint addresses concerns that such state fee statutes have been deployed in an unconstitutional manner as applied to Plaintiff, because measuring his "ability to pay" against

assets which are not on his personal balance sheet results in a deprivation of due process. Such a construction imputes financial capacity without notice, without a factual basis tied to his own property interests, and without a meaningful opportunity to contest obligations derived from assets he neither owns nor controls. Such assessment raises Fourteenth Amendment concerns because it imposes coercive financial burdens based on legally irrelevant third-party resources, creating an arbitrary and fundamentally unfair determination of ability to pay.

As a result of the above-described state fee awards, Plaintiff has expended all available litigation resources and – notwithstanding that federal fee capture from state court violates *inter alia* the Petition Clause and the Supremacy Clause – he is manifestly unable to subsidize opposing counsel in this forum.

**PETITION CLAUSE ANALYSIS**

A state court may not operate a toll booth on the road to federal court. The Petition Clause under the First Amendment protects not merely the right to file a federal civil-rights action, but the right to *prosecute* it without state-imposed penalties, burdens, or coercive conditions.

When a state tribunal conditions the exercise of federal rights on the payment of money to private litigants — especially the very actors accused of wrongdoing — it does not merely chill Petition Clause activity. It reorders the constitutional hierarchy, placing state domestic-relations machinery above federal judicial power.

That is not a fee dispute: the Defendants' attempt to undermine the Court's authority by seeking federal fee shifting in state court constitutes structural suppression of federal rights. The State of Illinois cannot impose a financial penalty on the act of filing a federal civil-rights suit. The Petition Clause forbids state-imposed burdens on federal litigation. States may not penalize,

chill, or burden the filing or prosecution of federal claims. This is not a "First Amendment" issue in the casual sense: it is a **federal supremacy concern**.

When a state court imposes financial, procedural, or punitive burdens tied to the filing or prosecution of federal claims, it does not merely chill Petition Clause rights — it attempts to subordinate federal judicial power to state domestic-relations machinery. That is irreparable harm not because it is personal, but because it is structural.

The right of access to the courts is indeed but one aspect of the right of petition. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) The filing of a lawsuit is a form of petitioning activity. *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983) *Bill Johnson's Restaurants* confirms that weak lawsuits are protected, losing lawsuits are protected and even lawsuits filed for mixed motives are protected. The Petition Clause protects **the act of filing**, not the perceived motive or the outcome. More recently, the Supreme Court has confirmed that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes. *BE&K Construction Co. v. NLRB*, 536 U.S. 516 (2002) For avoidance of doubt, the Supreme Court has more recently affirmed that a lawsuit is a petition. *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011)

The Seventh Circuit has adopted the Supreme Court's jurisprudence on the Petition Clause. Pursuant to *Woodruff v. Mason*, 542 F.3d 545 (7th Cir. 2008), the Seventh Circuit held that the right to petition includes the right of access to the courts. Going further, it held that filing a lawsuit constitutes protected Petition Clause activity and retaliation for filing a lawsuit violates the First Amendment. More recently, the Seventh Circuit has reaffirmed that the Petition Clause explicitly protects the rights of individuals to file lawsuits. See *Howell v. Miller*, 883 F.3d 1000 (7th Cir. 2019); *Bridges v. Gilbert*, 557 F.3d 541 (7th Cir. 2009).

A state statute may be perfectly valid in the abstract, yet unconstitutional in the specific way it is applied. When a state statute is used to penalize, burden, or chill the exercise of a federal constitutional right, the statute is unconstitutional *as applied*, even if valid in every other context. The Constitution does not yield to 508(a)(6). 508(a)(6) yields to the Constitution.

Put differently, Illinois statute 508(a)(6) permits family court litigants to seek fees incurred for ancillary litigation… until the moment it becomes an instrumentality to penalize federal litigation. At that moment, the statute becomes unconstitutional *as applied*.

"[A]lthough States retain substantial leeway to establish the contours of their judicial systems, they lack authority to nullify a federal right or cause of action they believe is inconsistent with their local policies." *Haywood v. Drown*, 556 U.S. 729 (2009)

**SUPREMACY ANALYSIS**

The elements of, and the defenses to, a federal cause of action are defined by federal law. States may not apply a state rule that is inconsistent with federal law. *Howlett v. Rose*, 496 U.S. 356 (1990) The policy of the federal Act is supreme, and the state courts must enforce it. *Testa v. Katt*, 330 U.S. 386 (1947) The states have no power to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress. *McCulloch v. Maryland*, 17 U.S. 316 (1819) States may not avoid their obligation to enforce federal law through the adoption of a jurisdictional rule. *Haywood v. Drown*, 556 U.S. 729 (2009)

A state statute that burdens, conditions, or penalizes access to federal court is not merely unconstitutional — it is jurisdictionally impermissible because it attempts to control the exercise of Article III power. A jurisdictional rule cannot be used as a device to undermine federal law, no matter how evenhanded it may appear. As also supported by *Howlett*, "[t]he fact that a rule is denominated jurisdictional does not provide a court an excuse to avoid the obligation to enforce

federal law if the rule does not reflect the concerns of power over the person and competence over the subject matter that jurisdictional rules are designed to protect." 496 U. S., at 381. Ensuring equality of treatment is thus the beginning, not the end, of the Supremacy Clause analysis. *Haywood v. Drown*, 556 U.S. 729 (2009)

Section 508(a)(6) may be evenhanded in design and may aim to level the playing field, but under *Haywood* and *Howlett*, evenhandedness does not permit a state statute to burden federal rights. When a state rule — neutral or otherwise — is applied in a way that penalizes or chills federal litigation, it becomes unconstitutional as applied because federal judicial power cannot be subordinated to state domestic‑relations mechanisms.

Section 508(a)(6) is not jurisdictional in form, but when applied to impose financial burdens tied to federal litigation, it produces an impermissible jurisdictional effect by suppressing the federal proceeding and weakening the federal court's ability to exercise its subject‑matter jurisdiction. Under *Haywood*, *Howlett*, and *McCulloch*, evenhanded state rules cannot be used to undermine federal judicial power.

**RIGHT OF ACCESS TO FEDERAL COURT**

Individuals must have a judicial avenue to seek redress for constitutional injury. *DeVillier v. Texas*, 601 U.S. 285 (2024) Federal jurisdiction is created by Congress, not the states. Under Article III and Section 27 of the Exchange Act, federal courts have **exclusive jurisdiction** over certain federal claims.

Federal access cannot be taxed because the Constitution guarantees an unobstructed avenue to federal judicial power, and states have no authority to impose financial, procedural, or punitive burdens on the exercise of federal rights.

Federal courts must hear federal claims even when they overlap with state proceedings.

*Gilbank v. Wood County Department of Human Services, 92 F.4th 569 (7th Cir. 2024)* (en banc) The fact that the underlying state proceedings are in family court is of no moment: the domestic relations exception does not strip federal courts of jurisdiction over federal questions. *Marshall v. Marshall*, 547 U.S. 293 (2006) Younger abstention is inapplicable because the challenged conduct is not part of any ongoing state enforcement proceeding, does not implicate the state's sovereign interests. At issue is a private fee-shifting mechanism rather than a coercive state process, outside of Younger's narrow domain. Abstention cannot override federal rights.

Moreover, federal access cannot be taxed because the Constitution guarantees an unobstructed avenue to federal judicial power. A state may apply its statutes — but not in a way that burdens or penalizes the exercise of federal rights. When a state statute is used to impose financial burdens tied to federal litigation, it fails *as applied*, and the Constitution is supreme.

Federal courts are designed to protect our fundamental rights when state systems are demonstrably and systematically corrupt and implicating the ongoing violation of constitutional rights. This court has jurisdiction to enjoin the state proceedings under the exception to Anti-Injunction Act (28 U.S.C. § 2283) wherein federal courts are allowed to enjoin state proceedings in case of a civil rights exception involving (a) 42 U.S.C. § 1983 violations, (b) a pattern of constitutional deprivations, and (c) systematic denial of due process. However, because the proposed TRO is exclusively tailored to **constraints against Defendants from seeking federal fees in state court** (which obviously portends ZERO disruption of a Custody Docket), the Anti-Injunction Act is not relevant to the instant analysis.

**PLAINTIFF IS LIKELY TO SUCCEED ON THESE MERITS**

As the threshold, success on the merits is cabined to the specific claim for which injunctive relief is sought, not the entire complaint. See *Chicago Women in Trades v. Trump*, 778

F. Supp. 3d 959, 983 (N.D. Ill. 2025) (The merits analysis focuses on the claim for which the plaintiff seeks preliminary relief); *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) (A plaintiff must show a likelihood of success on the merits of the claim underlying the injunction); *Turnell v. Centimark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015) (The threshold inquiry is whether the plaintiff has some likelihood of success on the merits of the claim for which the injunction is sought); *Winter v. NRDC*, 555 U.S. 7, 20 (2008) (The benchmark is success on the merits relating to the request for the injunction).

Following the Seventh Circuit jurisprudence on granting injunctive relief:

a. The Petition Clause protects Plaintiff's conduct.

Pursuant to the foregoing analysis, the Court is likely to see the constitutional emergency presented by Attorney Elster's federal fees petition filed in the state court.

b. The federal fee petition would deter a person of ordinary firmness.

The Seventh Circuit applies an objective test: whether the challenged action would deter a person of ordinary firmness from continuing to engage in protected activity. See *Surita*, *Douglas*. It is axiomatic that a fee petition seeking compensation for defense of federal claims would deter future petitioning. Financial sanctions tied to federal litigation are inherently chilling.

c. Plaintiff's protected activity caused the fee petition.

The fee petition seeks compensation for defense of this federal action. It is causally linked to Plaintiff's protected petitioning activity. The petition would not exist but for Plaintiff's filing and prosecution of federal claims.

d. Younger abstention is inapplicable; NDIL's recent framework favors intervention.

Younger abstention applies only to the three categories raised in *Sprint Communications,*

*Inc. v. Jacobs*, 571 U.S. 69 (2013): criminal prosecutions, quasi-criminal civil enforcement actions, and civil proceedings uniquely central to state courts' judicial functions.

The federal fee petition is none of these. It is a private request for a fee-shifting in a domestic-relations docket. It does not invoke state enforcement power, prosecutorial authority, or coercive state machinery.

Although Younger does not apply, Plaintiff voluntarily demonstrates that the fee petition independently satisfies the analytical framework recently employed by this Court in *American Academy of Pediatrics v. Florida Attorney General*, No. 1:26-cv-2401 (N.D. Ill. June 2, 2026). That framework considers whether the challenged state action: (a) is retaliatory, (b) is objectively meritless, and (c) whether it threatens protected First Amendment activity.

The fee petition satisfies each factor. This voluntary showing is offered to assist the Court and to underscore that the relief sought here is modest in comparison to the structural concerns addressed in that case.

**THE BALANCING ANALYSIS REQUIRED HERE**

Here, the balance of hardships of the prong test enshrined under *Winter v. NRDC*, 555 U.S. 7,20 (2008) tips sharply in favor of granting the temporary restraining order because constitutional rights are in the cross hairs. The protection of constitutional rights is "a purpose that is always in the public interest" *Dodds v. U.S. Dept. of Educ.*, 845 F. 3d 217, 222 (6th Cir. 2016). Even brief violations of constitutionally protected rights constitutes irreparable harm for which no payment of money damages can rectify the situation. "When constitutional rights are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)

The balancing tests are satisfied for federal injunctive relief. Civil rights and securities

law violations have accrued, and irreparable harm is on the horizon: the state court is set to light the Petition Clause ablaze in 21 days. The balance of hardships analysis proceeds according to (a) Exchange Act compliance vs. state court efficiency, (b) constitutional rights vs. state procedure, (c) federal supremacy in civil rights matters. The public interest analysis proceeds according to protecting Plaintiff from unconstitutional asset stripping in violation of the Fourteenth Amendment and Yeager Corp from a stealth control structure attack, enforcing federal civil rights laws and the Exchange Act.

Finally, there is no undue prejudice to the non-moving party under this request. Attorney Elster approached the bench in the Custody Docket without warning, in a clear attempt to obtain a shotgun ruling without briefing on August 5, 2026 (**Exhibit 3** at 4-8). The state court judge immediately recognized the impropriety of Attorney Elster's tactic and specifically instructed Beermann LLP "There is no urgency in this" (**Exhibit 3** at 18).

Plaintiff therefore respectfully requests that this Court grant his Emergency Motion for an Ex Parte TRO and sign the prepared TRO referenced in **Exhibit 1** and filed in the docket in a standalone document.

Dated: **August 22, 2026**

Respectfully submitted,

/s/ Matthew D. Yeager, In Pro Se
1047 Hickory Drive
Western Springs, IL 60558
Email: matthewyeager2024@gmail.com
Tel: (630) 862-1123

**EXHIBIT 1**

**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MATTHEW D. YEAGER,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN D. STEELE et al.,<br><br>Defendants. | Civil No. 1:26-cv-06793<br><br>District Judge Sharon Johnson Coleman |

**TEMPORARY RESTRAINING ORDER**

1. Defendant Sochor and her legal representation in state court shall hereby withdraw any pending fee requests relating to this federal matter in the state court.

2. Defendant Sochor and her legal representation in state court are hereby enjoined from propounding any further fee requests relating to this federal matter in the state court.

IT IS SO ORDERED. DATED:

______________________________ ______________________________

UNITED STATES DISTRICT JUDGE

**EXHIBIT 2**

All Domestic Relations cases will be heard by phone or video.
Go to http://www.cookcountycourt.org/LinkClick.aspx?fileticket=G7A8KAcSi8E%3d&portalid=0
to get more information and Zoom Meeting IDs.
Remote Court Date: No hearing scheduled

FILED
8/5/2026 12:06 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2020D002239
Calendar, 62
39365740

FILED DATE: 8/5/2026 12:06 PM 2020D002239

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT – DOMESTIC RELATIONS DIVISION**

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF: | ) | |
| | ) | |
| MATTHEW D. YEAGER, | ) | |
| Petitioner, | ) | Case No. 2020 D 2239 |
| | ) | |
| and | ) | Cal. 62 |
| | ) | |
| PAMELA SOCHOR, | ) | |
| Respondent. | ) | |

**RESPONDENT'S PETITION FOR INTERIM AND PROSPECTIVE <u>ATTORNEY'S FEES AND COSTS PURSUANT TO 750 ILCS 5/508(a)(6)</u>**

Respondent, Pamela Sochor, through her attorneys, BEERMANN LLP, and, pursuant to 750 ILCS 5/508(a)(6), seeks an award of interim and prospective attorney's fees and costs against Petitioner, Matthew D. Yeager, for the defense of ancillary federal litigation Matthew has commenced against Pamela as follows:

**<u>INTRODUCTION</u>**

1. Our legislature enacted the Leveling the Playing Field amendments to the Marriage Act to prevent wealthier parties from using their greater financial resources to out-litigate non-monied parties. Recognizing these policy goals, this Court has repeatedly ordered Matthew to pay Pamela's fees. Likely recognizing that this Court will not allow him to use his wealth to intimidate his former wife, Matthew turned to the federal court system in search of greener pastures, filing a lawsuit against both Pamela and her attorneys, stemming from orders entered in these proceedings. This Court should not permit Matthew to make an end-run around section 508(a) and leverage his greater financial resources to bully Pamela into

FILED DATE: 8/5/2026 12:06 PM 2020D002239

submission. Section 508(a)(6) exists for this very reason, it permits awards of fees for "[a]ncillary litigation incident to, or reasonably connected with, a proceeding under this Act." 750 ILCS 5/508(a)(6). There can be no serious question that Matthew's federal lawsuit, which turns almost exclusively on this Court's prior orders, meets that definition. An award of fees sufficient to permit Pamela to defend herself in those proceedings is appropriate here.

## BACKGROUND

2. The parties have been embroiled in post-judgment litigation concerning their daughter for several years, and are set to proceed to trial in August. Beermann LLP represents Pamela in these proceedings.

3. During that representation, Beermann sought and received several awards of interim and prospective attorneys fees from Matthew.

4. On June 8, 2026, the day of the comprehensive pretrial conference and just two days before this Court entered its third interim fee award, Matthew filed a civil action against Pamela and her attorneys in the United States District Court for the Northern District of Illinois, captioned *Yeager v. Steele, et al.*, No. 1:26-cv-06793 (the "Federal Action").[1]

5. In the Federal Action, Matthew asserts six claims, arising under 28 U.S.C. §1983, the Securities Exchange Act, and state law, each of which is explicitly premised upon this Court's prior fee awards. He indirectly challenges these awards as judicial takings, due process violations, contract clause violations, and, perhaps

[1] A copy of Matthew's federal complaint is attached hereto as **Exhibit A**.

FILED DATE: 8/5/2026 12:06 PM 2020D002239

most creatively, a hostile takeover bid for Hub Group.

6. Virtually every factual predicate for his Federal Action, as well as the damages he claims to have suffered, are explicitly predicated upon events occurring before this Court. By way of example, the Federal Action:

a. Cites the parties' 2021 MSA, including Matthew's allegation that Pamela waived any interest in certain trusts under the MSA;

b. Cites to this Court's fee rulings and findings regarding Matthew's "ability to pay";

c. Makes explicit references to these proceedings and multiple court dates therein; and

d. Sues Pamela's attorneys for their involvement as Pamela's counsel in these proceedings.

## ARGUMENT

7. Section 508(a) of the Marriage Act empowers this Court, "from time to time, after due notice and hearing, and after considering the financial resources of the parties, [to] order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees." 750 ILCS 5/508(a).

8. Subparagraph (a)(6) of section 508 permits awards of fees for matters outside the domestic relations division, including for "Ancillary litigation incident to, or reasonably connected with, a proceeding under this Act." 750 ILCS 5/508(a)(6).

9. Even prior to the enactment of section 508(a)(6), Illinois courts recognized the need to provide non-monied parties with awards of fees for matters collateral to dissolution actions.

10. In *Kent*, the Appellate Court held that section 508(a) allowed the wife to recover fees incurred in connection with her husband's bankruptcy proceedings, in

FILED DATE: 8/5/2026 12:06 PM 2020D002239

which he sought to discharge his obligations to her. *In re Marriage of Kent*, 267 Ill. App. 3d 142 (1994). And in *Davis*, the Appellate Court affirmed the wife's entitlement to an award of fees for her defense of a lawsuit filed by a creditor to enforce a debt allocated to her former husband, noting that it is "the purpose, not the location, of the proceeding that determines whether section 508 of the Act applies." *In re Marriage of Davis*, 292 Ill. App. 3d 802 (1997).

11. Our legislature enacted section 508(a)(6) as part of the 1997 leveling the playing field amendments. P.A. 89-712, § 5, eff. June 1, 1997. Since then, our courts have continued to apply the same principles to a range of collateral matters reasonably connected to a dissolution.

12. In *Nienhouse*, the First District affirmed a 508(a)(6) fee award in favor of a child's representative for fees incurred in a proceeding under the Illinois Domestic Violence Act, finding that "the domestic violence proceeding were reasonably connected with the dissolution action for purposes of authorizing the payment of these fees." *In re Marriage of Nienhouse*, 355 Ill. App. 3d 146, 155 (1st Dist. 2004)

13. In *Crouch*, the Appellate Court determined that custodial litigation in California and an Illinois related adoption proceeding both "were reasonably connected with proceedings under the Marriage Act and are subject to contribution under section 508(a)(6)." *Crouch v. Smick*, 2016 IL App (5th) 150222, ¶ 44.

14. The common thread running through these cases is the non-monied incurring legal fees in other courtrooms as a direct result of the actions of his or her

FILED DATE: 8/5/2026 12:06 PM 2020D002239

opponent in the domestic relations case.

15. For this reason, any reliance on *Milkowicz* by Matthew would be unavailing, as that case involved a request, by the mother, for fees she incurred in defending herself in criminal proceedings. Finding those proceedings were not ancillary to the divorce proceedings, the *Milkowicz* court noted that allowing fees for the defense of criminal proceedings would deter parties from "filing good-faith criminal complaints or contacting the authorities in good faith about the other party's misconduct by the threat of having to pay the attorney fees of the other party. This is especially so since the prosecution of the criminal case is not under the control of the complaining party and the State might decide not to proceed with the case for reasons unrelated to the merits of the case." Moreover, the State's burden of proof is higher than that of the civil litigant seeking the enforcement of the judgment." *In re Marriage of Miklowicz*, 2022 IL App (2d) 210713, ¶ 18.

16. These concerns are palpably absent here, where Matthew, not the state, has chosen to sue his former wife in federal court for obviously bad-faith reasons.

17. At bottom, this Court has already found, repeatedly, that Pamela should not be forced to exhaust her financial resources just to participate and defend herself in litigation with her former husband. The result should be no different simply because Matthew chose to open a new front in his war against Pamela in another courtroom.

18. As this Court has already found, Matthew has substantial financial resources and a superior ability to pay fees.

FILED DATE: 8/5/2026 12:06 PM 2020D002239

19. And, as this Court has already found, Pamela does not.

20. Pamela has incurred and will continue to incur substantial attorneys fees and costs in defending the Federal Action. She has already successfully defended a motion by Matthew to disqualify her attorneys and will be seeking the dismissal of his complaint.

21. The affidavits of Matthew D. Elster and Pamela Sochor are attached hereto.

**WHEREFORE**, Petitioner, PAMELA SOCHOR, respectfully requests that this Court enter an Order:

A. Finding that *Yeager v. Steele*, No. 1:26-cv-06793 (N.D. Ill.), is ancillary litigation incident to, or reasonably connected with, this proceeding within the meaning of 750 ILCS 5/508(a)(6);

B. Ordering Respondent, MATTHEW D. YEAGER, to pay a reasonable amount of Petitioner's interim and prospective attorney's fees and costs incurred and to be incurred in the defense of the Federal Action, in an amount to be determined by the Court, pursuant to 750 ILCS 5/508(a)(6) and (a-5);

C. Directing that such fees and costs be paid directly to Beermann LLP, which may enforce the Order in its own name, pursuant to 750 ILCS 5/508(a);

D. Setting this Petition for expeditious hearing on a non-evidentiary, summary basis pursuant to 750 ILCS 5/508(a-5); and

FILED DATE: 8/5/2026 12:06 PM 2020D002239

E. Granting such other and further relief as this Court deems just and equitable.

Respectfully submitted,

**BEERMANN LLP**

By: /s/ *Matthew D. Elster*

One of Respondent's Attorneys

**BEERMANN LLP**
161 N Clark Street #3000
Chicago, IL 60601
312.621.9700
mdelster@beermannlaw.com
Firm No. 80095

**EXHIBIT 3**



IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - DOMESTIC RELATIONS DIVISION

| | | |
|---|---|---|
| IN RE: THE MARRIAGE OF: | ) | |
| MATTHEW D. YEAGER, | ) | |
| Petitioner, | ) | |
| vs. | ) | 2020 D 2239 |
| PAMELA SOCHOR f/k/a PAMELA YEAGER, | ) | |
| Respondent. | ) | |

TRIAL REPORT OF PROCEEDINGS had before the HONORABLE GERI PINZUR ROSENBERG, Judge of said Court, at the Richard J. Daley Center, taken before PEGGY CURRAN, CSR, RPR, CSR License No. 084-002016, taken on Wednesday, August 5, 2026 commencing at about the hour of 1:00 p.m.

PRESENT:

Mr. David M. Stein
Ms. Kellie J. Snyder
Ms. Lisa Ben-Isvy
Stein & Stein, Ltd.
30 North LaSalle Street
Suite 3910
Chicago, Illinois 60602
312.641.0611
dms@stein2.com
on behalf of the Petitioner;.

Mr. Jonathan D. Steele
Ms. Candace L. Meyers
Mr. Matthew D. Elster
Beermann LLP
161 N. Clark Street
Suite 3000
Chicago, Illinois 60601
312.621.9700
jsteele@beermannlaw.com
clmeyers@beermannlaw.com
on behalf of the Respondent;

Mr. David M. Sternfield
Davis Friedman
135 South LaSalle Street
Chicago, Illinois 60603
312.782.2220
dsternfield@davisfriedman.com
appearing as the GAL.

Also Present:

Mr. Matthew D. Yeager
Ms. Pamela Sochor

I N D E X


| WITNESS | PAGE |
|---|---|
| MATTHEW D. YEAGER | |
| EXAMINATION (continued) | |
| By Mr. Steele | 20 |

| RESPONDENT'S EXHIBITS | RECEIVED |
|---|---|
| No. 50-A | 82 |
| Nos. 12-A, B and C | 126 |

THE COURT: I will have everybody's name on the record.

MR. STEIN: Good afternoon, Judge, this is In Re: The Marriage of Matthew D. Yeager versus Pamela Sochor, 2020 D 00239.

David Stein, along with Kellie J. Snyder and Lisa Ben-Isvy, B-e-n-I-s-v-y, on behalf of the petitioner Matthew D. Yeager, who is also present in open court.

THE COURT: Sounds good.

MR. STERNFIELD: I'm David Sternfield, the guardian ad litem to the minor child.

MR. STEELE: Jonathan Steele and Candace Meyers and Matt Elster from Beermann. We represent Pamela Sochor, who is also present.

THE COURT: Okay. With that, I saw the motion come through. I am assuming that is why you are here?

MR. ELSTER: I am hoping to come in and come out. We are presenting a petition for fees under Section 508(a)(6) today related to the federal litigation Mr. Yeager filed.

Obviously first time up. Obviously less than an hour's notice.

Obviously I am not asking Mr. Stein to --

MR. STEIN: Never saw the pleading.

MR. ELSTER: It's been served.

All we would ask for is a briefing schedule, your Honor

THE COURT: I just saw it come through, but I didn't see any file stamps or anything.

MR. ELSTER: The filing has been accepted. I have file stamped copies. I will tender a copy to counsel.

THE COURT: Do you have a copy for Mr. Stein?

MR. ELSTER: Absolutely.

THE COURT: Obviously I am not going to rule on anything right now.

MR. ELSTER: We are simply trying to avoid an additional --

THE COURT: I understand. But we are also -- this is what we are going to do.

You haven't read it yet?

MR. STEIN: No.

THE COURT: I am going to enter and continue this until Friday. One of the other attorneys from your office wants to present it at that time. Let

me let Mr. Stein at least read the pleading because filing it an hour before court is really not sufficient.

MR. ELSTER: I understand.

THE COURT: I know I am not ruling on it. I think it would be fair for you to get to see what's going on.

So let's enter and continue it until Friday at 1:00 p.m. If one of the attorneys that is already going to be here, wishes to present it at that time, that's fine. If you wish to present it, that's between you and your law firm.

You at least have an opportunity to read it.

MR. STEIN: I just want to say for the record, Judge, it's not noticed up as an emergency. So there is no reference to an emergency notice or anything about that. So the whole service is improper.

MR. ELSTER: I would just like to say for the record, Local Rule 2.1(a) requires prior written notice, except in actions appearing on the daily trial call or during the course of trial.

I appreciate Mr. Stein's comment.

Rule 2.1(a) allows this.

I will say, your Honor, given the nature of the lawsuit that Mr. Yeager has filed, I am handling -- the only attorney in the office handling that matter.

THE COURT: I will see you Friday.

MR. ELSTER: I will be in Colorado.

THE COURT: Can you appear remotely on Friday or I can set this over for another court date?

MR. ELSTER: I am just trying to avoid more court dates, more fees.

MR. STEIN: I would like to avoid Friday, Judge.

THE COURT: Do the two of you want to go in the back and see if you want a briefing schedule or do you want me to hold this over?

MR. STEIN: Sure.

THE COURT: I agree notice isn't proper. I feel like you haven't even gotten to see it. I just saw it a second ago. I had an opportunity to briefly skim it.

MR. STEIN: I would like to have, if your Honor would permit it, I would like to have an off-the-record side bar with your Honor before we

start and before I discuss the briefing schedule with Mr. Elster, with the lawyers.

THE COURT: Okay. Do you want to go in the back?

MR. STEIN: Anywhere where it's quiet.

THE COURT: That's fine. Do you want to do that before this or can we address this so I can release Mr. Elster?

MR. STEIN: Sure. I will address it. Give me two -- can I have a minute?

THE COURT: Yes, absolutely.

MR. ELSTER: Thank you, your Honor.

THE COURT: You haven't even read it yet. Let's see how you guys want to handle this.

(A recess was had.)

THE COURT: The attorneys can step up. Any record you wish to make?

MR. STEIN: Thank you, Judge.

THE COURT: Mr. Stein.

MR. STEIN: I would.

THE COURT: Do I have everybody back here now?

MR. STEIN: I think so.

So Judge, before Mr. Yeager resumes the stand, I would like to make an oral motion to

strike his testimony and Exhibit 101 that was marked by Respondent in this case for the following reasons:

One, it violates your motion in limine order that says any documents not produced before June 9 of 2026 would be barred -- June 19, excuse me -- of 2026 would be barred.

This was discovery that was available. This was discovery that should have been produced. This was discovery that Respondent knew about in advance.

And how do I know that? Because when Respondent filed his motion in limine -- excuse me, when Respondent filed her motion in limine to exclude texts between the parties, and then later withdrew that motion, it became clear to me last night as I was thinking about it that there was something about Exhibit 101 that I wasn't clear about.

And the concern that I have is the manner in which it was presented to me.

If you look at my desk, you will see three huge trial binders that have 70 exhibits in them which are Respondent's exhibits. They were

sent to me electronically that we paid to have printed.

Yesterday when I said do you have a copy of Exhibit 101, they handed me another binder two inches thick, which is a mishmash of exhibits from all different times, all different numbers in all different orders.

Their trial exhibit list goes to 70. They started with 101.

The exhibit they marked as Exhibit 101, you will see at the bottom -- and I am handing it to the Court -- was printed on either July 29th or August 1st. At the very bottom it's in tiny print.

Your Honor may need a magnifying glass to see it.

THE COURT: I may need readers for that.

MR. STEIN: Understood. And I didn't notice it last night. But when I thought about it on the way home, I thought it was very odd, very strange that Mr. Steele started with this Exhibit 101.

And I know he is going to tell you that he used it for impeachment purposes. But impeachment -- you don't have to give documents for impeachment. That's a prior inconsistent

statement.

The texts that were attached to his response to the motion in limine were not a prior inconsistent statement.

They knew this document existed because the texts go back to 2020. And even to later than --

THE COURT: Just curious. I will allow a response on the record. Here is the deal. You are going to have to put this in writing in a motion.

MR. STEIN: I understand.

THE COURT: I will give counsel time to respond. But just curious here. If these are in fact text messages between your client and the Petitioner in this case, wouldn't he also have had it in his possession too?

MR. STEIN: He might. But this was extracted -- exported by someone. So we don't even know what the foundation is is proper.

I think yesterday there was some question about whether the foundation was properly laid. There was a comment made by Mr. Steele that we stipulated to the foundation of all exhibits.

But yes, those were exhibits that have

been previously produced and were part of the trial exhibit list.

THE COURT: Right.

MR. STEIN: They weren't exhibits that have not been produced in which your Honor ruled would be barred as part of our motion in limine.

THE COURT: I guess my question is, in theory, it sounds like there was potentially -- I don't know until you file this motion -- let's just say hypothetically two sets of the same text message, one was like a screen shot from your phone, and one -- it may be that covered the date, and then another one that was the screen shot that showed the actual time stamp.

That's all I am asking.

MR. STEIN: I don't know the answer to that, Judge. I am not an expert in calling out text messages between the parties.

As I mentioned to you in the back, I am going to be asking for not only monetary sanctions against the Beermann firm, but I am also asking that that testimony and the exhibit not be admitted into evidence.

We will put it into a formal motion.

THE COURT: File a motion and notice it up. I will give you time to respond.

Is there any record you want to make on the record right now?

MR. STEELE: Yes. I am not familiar with oral motions generally speaking, so I am not exactly sure what counsel is doing. I am not sure if he is asking you to reconsider an objection that wasn't made. I am not sure if he is asking you to rule on the admission of a document that I have not yet offered into evidence.

So it's either late or premature. I am not sure.

If he is saying it's a discovery violation, we had a hearing on a motion to compel and we were not ordered to produce anything that was equally available to both parties.

So to your Honor's point, if the texts were equally available, we are not in violation of any Court order.

Yes, we stipulated to the foundation of texts between the parties. Yes, it was limited to exhibits that were tendered.

But Mr. Stein wanted to add to it, or

anything that was attached to a pleading.

These texts are attached to, I don't know, half a dozen pleadings that were filed by his client --

MR. STEIN: Not Exhibit 101.

THE COURT: Hold on.

MR. STEELE: Same text messages. All we added was the real date because his client saw fit to represent to the Court that they were sent in July of 2021 so that he could have the benefit of saying, she wasn't really afraid at the time of the order of protection.

When in fact they were sent, I don't know, six months earlier.

So yeah, I understand why he is objecting, because it hurts. It shows that his client got up there and lied. It shows that his client lied when he signed the verification on all these motions.

But there is no legal basis. So sure, file a motion; we will respond.

MR. STEIN: It's sandbagging, Judge. As simple as that.

MR. STEELE: Sandbagging is dragging me in

back and trying to argue this off the record.

MR. STEIN: It's sandbagging, Judge. That's okay. It's a good lesson for the young lawyers who will become lawyers.

THE COURT: Well, the lawyers that are observing court right now have no idea what transpired in the background. And some of them haven't even taken Evidence 101 in law school. So I don't know that they are going to quite understand what's happening right now. No fault on them.

But right now I have this oral motion. As I indicated in the back, and I will say this again, get a motion on file because I'm sure you need to look at the transcript, and I'm sure you want to look at the transcript.

And frankly, if you are asking me to order sanctions based on the testimony that was presented yesterday, then I need to look at the transcript as well.

MR. STEIN: Got it.

THE COURT: You both know me by now. I don't tend to rule just off the cuff from the bench. So let's be thoughtful about this. You want to file a

motion, get your motion on file. We are going to continue with the trial.

MR. STEIN: Just so we are clear, every time an exhibit is offered, I need time to make sure it was an exhibit that was previously produced and it's something that we have within our possession and control.

THE COURT: I don't have -- I have always done this in any trial. I have no problem -- I think I said yesterday, because there was a question, do I need to ask permission to step up to the witness. I don't have a problem with that. You don't need to ask my permission for either side.

But that being said what I said yesterday, I will say again, just make sure your opposing counsel has the opportunity to get to the exhibit they need to look at before you approach the bench.

MR. STEIN: Right. I didn't have the exhibits until they handed them to me late in the day yesterday.

THE COURT: I understand that. Here is the thing. I know you want to make a record. You have made your record. But the bigger issue is, go get

something on file.

MR. STEIN: Yep. Understood.

THE COURT: So that counsel can respond to it. Then I will review it and make that determination.

Right now there is no written motion before the Court.

MR. STEIN: Sounds good, Judge.

MR. STEELE: Can I ask a point of clarity. Just because sometimes we bicker about the drafting of orders. By sometimes, I mean almost every time.

THE COURT: You guys can write it up in the courtroom.

MR. STEELE: To the extent counsel writes an order that gives himself leave to file --

THE COURT: Wait. Wait. I am sorry. Let me take a step back.

MR. STEIN: She wants me to notice up a motion.

THE COURT: Let me take a step back. There is no need for an order. There has been no motion filed.

I am just saying I am not going to rule on this because you have run into court and said I

want sanctions.

I would do the same thing if you came in running and said I want sanctions.

MR. STEIN: I will give you an hour's notice like you guys did.

MR. STEELE: I don't think that's appropriate.

I just want to be clear because if he was going to say I want leave, we might file our own motion saying you filed six pleadings saying these were sent in July and they weren't. So that's not true either.

THE COURT: Okay. I don't think I have anymore information right now than I did yesterday. Okay. If you want to file a motion, file a proper motion before the Court; notice the other side. There is no urgency in this.

MR. STEIN: Understood.

THE COURT: I can always strike testimony if the Court deems it would be appropriate to. I don't know that it is. I am just saying like that's something I can always strike from the transcript and then the court doesn't consider it.

If there is a basis for sanctions, I can always award those. There is no emergency to

this.

MR. STEIN: I don't think it's an emergency, Judge. I agree with you. I will be happy to file the motion and notice it up.

THE COURT: Yes. There is no Court order saying I gave you leave.

MR. STEIN: No, understood.

THE COURT: You don't need leave of Court.

People say can I get leave for this. You don't need leave of Court for a lot of things. File your motion.

MR. STEIN: You can file a phone book. I've got it, Judge.

THE COURT: Okay. With that --

Aren't you all glad you came to watch.

So with that, are we ready to proceed?

Mr. Yeager, if you want to step up, please. Thank you.

Just to remind everyone, if Court is in recess, you can check your phones. Otherwise have your phones away during the proceedings.

Mr. Yeager, if you can raise your hand.